IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

**CANAL INSURANCE COMPANY**                                                                         **PLAINTIFF**

**V.**                         **CAUSE NO. 4:10-CV-00009-CWR-LRA**

**RUSSELL DALE OWENS d/b/a/ OWENS
TRUCKING; JAMES H. PENINGER, JR.;
AND AMANDA PUGH, INDIVIDUALLY
AND ON BEHALF OF ALL WRONGFUL**                     **DEFENDANTS**
**DEATH BENEFICIARIES OF JUDY
BLANKS BEARDEN**

## ORDER

The above-styled matter is before the Court on the motions for summary judgment of the plaintiff, Canal Insurance Company, and defendant Amanda Pugh. The Court has considered the arguments and authorities offered in support of both motions and, after due deliberation, has concluded that the plaintiff's motion should be denied and that Amanda Pugh's motion should be granted.

On November 15, 2006, Miller Cattle Company, Inc. (hereinafter "Miller"), of Marion, Mississippi, purchased 117 calves from sources in the following cities: Livingston, Linden and Roanoke, Alabama; Athens and Washington, Georgia; Carthage and Kosciusko, Mississippi; and Orangeburg, South Carolina.[1] The next day, Miller sold the same 117 calves to Roger Walker of Okemah, Oklahoma.[2] Walker purchased the cattle with the ultimate intent to have them

---

[1] Defendant Amanda Pugh's Memorandum of Law in Support of Motion for Summary Judgment [Docket No. 35] (hereinafter "Pugh memo") at 2.

[2] Pugh memo at 2.

transported to certain properties in either Oklahoma or Kansas,[3] but first, the cattle needed to spend 30-45 days at a preconditioning[4] lot to strengthen them for the long journey to the Midwest.[5] For that purpose, Walker had Miller ship his newly purchased calves to a preconditioning lot in Courtland, Mississippi.[6]

Miller hired Russell Dale Owens d/b/a Owens Trucking (hereinafter "R.D. Owens") to transport the calves. James Peninger (hereinafter "Peninger"), an employee of R.D. Owens, was tasked with the responsibility of transporting the cattle.[7] Judy Blanks Bearden (hereinafter "Bearden") rode as a passenger,[8] although R.D. Owens contends that Bearden's presence was "unauthorized."[9] But while en route, the vehicle crashed in Neshoba County, Mississippi, and Bearden was killed.[10]

In time, a negligence suit was brought against Peninger and R.D. Owens in Neshoba

---

[3] Pugh memo at 3.

[4] According to Pugh's memo, "[p]reconditioning involves giving the young calves their vaccination shots, worm treatments, dehorning, and any other health treatments that were medically necessary. Preconditioning helps ensure that the young calves are healthy before they are shipped to their final destination, otherwise the young calves' health could be compromised and they could get sick and die." Pugh memo at 3.

[5] Pugh memo at 3.

[6] Pugh memo at 3.

[7] Pugh memo at 3.

[8] Pugh memo at 3.

[9] Memorandum Brief in Support of Canal Insurance Company's Motion for Summary Judgment [Docket No. 37] (hereinafter "Canal memo") at 1. However, Canal does not appear to argue that Bearden's lack of authority to ride in the truck entitles Canal to the relief it seeks.

[10] Pugh memo at 4.

County Circuit Court by Amanda Pugh, individually and on behalf of Bearden's wrongful death beneficiaries (hereinafter collectively "Pugh").[11]

Shortly after the institution of the negligence suit, Canal Insurance Company (hereinafter "Canal"), which insured R.D. Owens on the date of the crash,[12] filed a declaratory-judgment action in federal court[13] in the hopes of establishing that its policy with R.D. Owens creates no duty to defend R.D. Owens and Peninger in the Neshoba County case.[14]

On June 1, 2011, Pugh moved for summary judgment.[15] Essentially, Pugh argues that even if the terms of the Canal policy itself create no duty to indemnify, the terms of an attached endorsement do so.[16] That same day, Canal filed its own motion for summary judgment[17] in which it argues, among other things, that the scope of the attached endorsement does not extend so far from the policy's core terms as to include a set of facts such as that surrounding the case at

---

[11] Pugh memo at 4.

[12] Exhibit A Part 1 to Complaint [Docket No. 1-2] (hereinafter "Policy").

[13] Canal has invoked the diversity jurisdiction of this court, *see* Title 28, Section 1332, and brings this action under the Declaratory Judgment Act, Title 28, Section 2201, which provides in part that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

[14] *See generally* Complaint.

[15] Defendant Amanda Pugh's Motion for Summary Judgment (hereinafter "Pugh Motion") [Docket No. 34].

[16] Pugh memo at 6-12.

[17] Canal Insurance Company's Motion for Summary Judgment [Docket No. 36].

hand.[18]

## STANDARD OF REVIEW

Although motions for summary judgment are filed frequently, not every case is suitable for such disposition. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] When confronted with these motions, this Court focuses on "genuine" disputes of "material" facts. An issue is genuine "if the evidence supporting its resolution in favor of the party opposing summary judgement, together with an inference in such party's favor that the evidence allows would be sufficient to support a verdict in favor of the party."[20] A fact is material if it is one which might affect the outcome of the suit under the governing law. Factual disputes that are irrelevant or unnecessary will not be considered.[21] Likewise, unsubstantiated assertions are not competent summary judgment evidence.[22]

The jury has the responsibility to assess the probative value of the evidence. As a consequence, a court must step back and refrain from making credibility determinations, and it must not weigh evidence or draw from the facts legitimate inferences for the movant.[23] This

---

[18] Canal memo at 12-13.

[19] Fed. R. Civ. P. 56(a).

[20] *Zisman v. Mason*, 2008 WL 879726, *3 (S.D. Miss. 2008) (citing *Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987).

[21] *Id*.

[22] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

[23] *Strong v. Dept. of Army*, 414 F. Supp. 2d 625, 628 (S.D. Miss. 2005).

Court is ever mindful that although a useful device, summary judgment "must be employed cautiously because it is a final adjudication on the merits."[24]

But in cases like the one at hand, where the relevant facts are not in dispute and the critical questions turn purely on legal rights and relationships, summary judgment is appropriately considered.[25]

## ANALYSIS

**Whether the Original Provisions of the Insurance Policy Create in Canal a Duty to Indemnify.** Canal argues against virtually no rebuttal that the original terms of its insurance policy with R.D. Owens – that is, those terms not included within the MCS-90 Endorsement[26] – do not call for coverage of any injury suffered by Pugh.

Specifically, the Occupant Hazard Exclusion of Canal Policy No. 343488 provides as follows: "It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability does not apply to Bodily Injury including death at any time resulting therefrom, sustained by any person while in or upon, entering or alighting from the automobile."[27] In Canal's view, this provision explicitly "does not provide coverage for the claims made against Russell Dale Owens or James Peninger in the underlying litigation,"[28] and Canal cites in support a 2009 district court

---

[24] *Jackson v. Cain*, 865 F.2d 1235, 1241 (5th Cir. 1989); *Hulsey v. State of Texas*, 929 F.2d 168, 170 (5th Cir. 1991).

[25] *See Nabers v. Morgan*, 2011 WL 359069, *3 (S.D. Miss. 2011).

[26] *See infra* at 6-7.

[27] Policy at 14.

[28] Canal memo at 11.

opinion vindicating that view of the Occupant Hazard Exclusion.[29]

The language of the Occupant Hazard Exclusion is straightforward, and even Pugh spills no ink to refute Canal's interpretation thereof. The Occupant Hazard Exclusion, in and of itself, demonstrates no duty relevant to the Neshoba County proceedings.

**Whether the MCS-90 Endorsement Applies.** Federal law requires that a motor carrier engaged in interstate commerce carry a minimal amount of liability coverage.[30] In order to comply with that requirement, a motor carrier may attach to an otherwise deficient insurance policy an MCS-90 Endorsement, the terms of which are established by federal regulation. In relevant part, federal regulations set forth the following provisions for an MCS-90 Endorsement:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).
>
> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits

---

[29] *Canal Ins. Co. v. Bumble Bee Express*, No. 5:08-cv-01063-IPJ (N.D. Ala. June 2, 2009).

[30] 49 U.S.C. § 13906(a)(1); 49 C.F.R. § 387.

of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the Insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.[31]

The MCS-90 Endorsement has been a frequent topic of discussion in federal courts. The endorsement is consistent with the purpose of the Motor Carriers Act of 1980 (hereinafter "MCA") and the regulations promulgated pursuant thereto, "which were designed to stem the unregulated use of non-owned vehicles that threatened both public safety and the vitality of the trucking industry."[32] "The purpose of the MCS-90 endorsement is to assure compliance with federal minimum levels of financial responsibility for motor carriers. The endorsement . . . obligates an insurer to pay certain judgments against the insured arising from interstate commerce activities, even though the insurance contract would have otherwise excluded coverage"[33] As noted in the preamble to the MCA's regulations:

[t]he purpose of these regulations is to create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that

---

[31] 49 C.F.R. § 387.15. *See also* Exhibit E to Pugh Motion [Docket No. 34-5] (hereinafter "Canal's MCS-90 Endorsement") at 1.

[32] *Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.*, 930 F.2d 258, 261 (2nd Cir. 1991) (citing *Empire Fire & Marine Ins. Co. v. Guar. Nat'l Ins. Co.*, 868 F.2d 357, 363 (10th Cir. 1989)).

[33] *Canal Ins. Co. v. Coleman*, 625 F.3d 244, 247 (5th Cir. 2010).

7

motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on the public highways.[34]

"Basically, the MCS-90 makes the insurer liable to third parties for any liability resulting from the negligent use of any motor vehicle by the insured, even if the vehicle is not covered under the insurance policy."[35] "In short, the endorsement requires [an insurer] to pay any final judgment against [the insured] for public liability resulting from the negligent use of motor vehicles subject to the financial responsibility requirements of Section 29 and 30 of the Motor Carrier Act of 1980."[36]

The question of whether the MCS-90 Endorsement applies in any given case is an issue of federal law.[37] However, "the endorsement covers vehicles only when they are presently engaged in the transportation of property in interstate commerce."[38]

In the case at bar, Pugh contends that she has suffered injuries due to Peninger's negligence and R.D. Owens' vicarious liability during a transportation of property in interstate

---

[34] 49 C.F.R. § 387.1.

[35] *T.H.E. Ins. Co. v. Laresen Intermodal Servs., Inc.*, 242 F.3d 667, 671 (5th Cir. 2001). *See also Pierre v. Providence Wash. Ins. Co.*, 99 N.Y.2d 222, 226 784 N.E.2d 52, 53-54 (N.Y. 2002) (describing the endorsement as one that "shifts the risk of loss for accidents occurring in the course of interstate commerce away from the public by guaranteeing that an injured party will be compensated even if the insurance carrier has a valid defense based on a condition in the policy").

[36] *Coleman*, 625 F.3d at 248.

[37] *Id.*

[38] *Id.* at 249. *See also id.* at 251 (surveying differences of opinion among federal courts).

commerce.[39] In Pugh's view, she is precisely the sort of "third party"[40] to whom the MCS-90 Endorsement is directed.

Canal offers four specific arguments in opposition to Pugh's interpretation. First, Canal argues that the MCS-90 Endorsement merely establishes a surety and "does not create insurance coverage nor alter existing insurance coverage."[41] Second, Canal contends that federal regulations specifically exempt from the MCS-90 Endorsement's scope any transportation of ordinary livestock.[42] Third, Canal claims that Peninger was not engaged in interstate commerce because both his place of origin and intended destination were within Mississippi.[43] And fourth, Canal argues that the MCS-90 Endorsement only insured R.D. Owens, the named insured, and does not apply to any negligent acts on the part of Peninger.

Canal's contention that the MCS-90 Endorsement "does not create insurance coverage nor alter existing insurance coverage"[44] is incorrect. It is true that courts have described the MCS-90 Endorsement's obligation "as one of suretyship."[45] But courts have not viewed the MCS-90 Endorsement's function as one limited by that technical definition; its primary function

---

[39] Pugh memo at 10.

[40] *T.H.E.*, 242 F.3d at 671. *See also Herkes v. Doe*, 2002 WL 465192, *1 (E.D. La. 2002) (where underlying insurance policy provides no coverage for the vehicle, the MCS-90 Endorsement is triggered for benefit of the plaintiff).

[41] Canal memo at 13.

[42] Canal memo at 13.

[43] Canal memo at 14.

[44] Canal memo at 13.

[45] *T.H.E.*, 242 F.3d at 672 (citing with approval *Canal Ins. Co. v. Carolina Cas. Ins. Co.*, 59 F.3d 281, 281 (1st Cir. 1995)).

is "to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers."[46] It "accomplishes its purpose by reading out . . . those clauses in the policy that would limit the ability of a third party victim to recover for his loss."[47]

The strongest rebuttal to Canal's argument comes from the plain language of the MCS-90 Endorsement itself, which reads, in relevant part:

> It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the [insurer] from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured.[48]

In short, no policy to which an MCS-90 Endorsement applies can be read to deny coverage of injuries suffered by a third party through the negligent acts of the insured, even when

---

[46] *Canal Ins. Co. v. First Gen. Ins. Co.*, 889 F.2d 604, 611 (5th Cir. 1989).

[47] *T.H.E.*, 242 F.3d at 673. *See also Adams v. Royal Indem. Co.*, 99 F.3d 964, 968 (10th Cir. 1996) (the endorsement "is designed to required ICC-certified carriers to *insure* against public liability for all their motor vehicles that are subject to the financial responsibility requirements of the Motor Carrier Act . . . .") (emphasis added); *Real Legacy Assurance Co. v. Santori Trucking, Inc.*, 560 F. Supp. 2d 143, 146 ("MCS-90 endorsement *ensures* that a motor carrier has independent financial responsibility to pay for losses sustained by the general public arising out of its operations.") (emphasis added).

[48] *See Integral*, 930 F.2d at 262 ("[W]hen a judgment is entered against the owner of a motor vehicle insured under an MCS-90 endorsement, the insurer is obligated to indemnify, even when the judgment is based on a theory of vicarious liability."). *See also Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 881 (10th Cir. 2009) (*en banc*) ("The MCS-90 endorsement comes into play . . . where (1) the underlying insurance policy to which the endorsement is attached does not otherwise provide liability coverage, and (2) the carrier's other insurance coverage is either insufficient to satisfy the federally[ ] prescribed minimum levels of financial responsibility or is non-existent."); 7A Couch on Ins. § 109:83 (3d. ed. 2011) ("The manifest purpose of laws making liability insurance mandatory for motor carriers is the protection of passengers and members of the public who may be injured by the negligence of the operators of such conveyances, rather than employees of the insured injured in the course of employment.").

other provisions within the same policy would accomplish precisely that result.[49] Canal's argument to the contrary is not compelling.

Canal's second argument, wherein it contends that the MCS-90 Endorsement does not apply to transportations of ordinary livestock, is similarly unpersuasive. The suggestion takes root in Title 49, Section 13506(a)(6)(A) of the United States Code, which provides that "[n]either the Secretary [of Transportation] nor the [Surface Transportation] Board has jurisdiction under this part over . . . transportation by motor vehicle of . . . ordinary livestock[.]" According to Canal, the provision denounces the Secretary of Transportation's authority to regulate transportation of "ordinary livestock" and, therefore, leaves Canal's MCS-90 Endorsement inapplicable to Peninger's crash in Neshoba County.

This argument is not persuasive because this limitation does not apply to the authority under which the MCS-90 Endorsement regulation was created. Section 13506 falls under Subtitle IV, Part B of Title 49, whereas the MCS-90 Endorsement regulated was promulgated pursuant to Title 49, Section 31139[50] – which falls not under Subtitle IV, Part B, but rather under Subtitle VI, Part B.

Moreover, the jurisdictional limitation enunciated by Section 13506 was designed not to encumber the Department of Transportation but, rather, the Interstate Commerce Commission. Today, it continues to limit the authority of the Surface Transportation Board,[51] but the

---

[49] *T.H.E. Ins. Co. v. Laresen Intermodal Servs., Inc.*, 242 F.3d 667, 671 (5th Cir. 2001).

[50] *See Century Indem. Co. v. Carlson*, 133 F.3d 591, 599 (8th Cir. 1998) (identifying 49 U.S.C. § 31139 as statutory source of 49 C.F.R. § 387.7).

[51] *Id.* at 599-600.

11

Department of Transportation's authority is broader than that formerly enjoyed by the ICC.[52] The plain text of Section 13506(a)(6)(A) makes clear that it concerns itself only with "transportation by motor vehicle of . . . ordinary livestock," but as the Eighth Circuit has observed, "[t]he exempt nature of the commodity has no bearing on the application of the MCS-90 endorsement. . . . Once the endorsement is provided, it covers the truck in its interstate operations regardless of the commodity being transported"[53]

Section 13506 does not imply a hole in the MCS-90 Endorsement's coverage when the offending motor vehicle contains livestock, and Canal's argument to the contrary is rejected. To read in this "exclusion" would thwart the regulation's primary purpose: to provide for "an appropriate level of financial responsibility for motor vehicles operated on public highways."[54] Neither the statute nor the regulation makes an exception for vehicles carrying livestock; neither will this Court.

Next, Canal argues that the transportation at the center of the case at hand was intrastate rather than interstate and, therefore, did not fall within the authority of the MCS-90 Endorsement.

The Fifth Circuit has held that the MCS-90 Endorsement "covers vehicles only when they are presently engaged in the transportation of property in interstate commerce."[55] Canal argues that because Peninger attempted merely to transport the livestock from one Mississippi location to another, the transportation enjoyed no interstate character. According to Canal, the character of

---

[52] *Id.* at 599.

[53] *Id.* at 600.

[54] 49 C.F.R. § 387.1.

[55] *Canal Ins. Co. v. Coleman*, 625 F.3d 244, 249 (5th Cir. 2010).

commerce is determined by the shipper's fixed and persisting intent at the time of the shipment, and in this case, Peninger intended only to transport the livestock within Mississippi.[56]

But Canal's argument rests on a fundamental flaw: Peninger was not the shipper. Peninger was merely the ill-fated truck's driver. Roger Walker of Okemah, Oklahoma, who purchased the calves with the ultimate goal of receiving them at property in either Oklahoma or Kansas, was the calves' true shipper; he was their owner, and only he had the legal authority to order their shipment. Peninger was no more the shipper than a Postal Service truck driver is a mailer.

Canal's contention crumbles for more thorough reasons as well because the question of whether transportation was interstate or intrastate is not so simple as to rest on determining the points where a driver's foot engaged and alighted from the accelerator. The Fifth Circuit has held that "characterization of transportation between two points in a State as interstate or intrastate in nature depends on the essential character of the shipment. Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment."[57] In determining whether a transportation was interstate or intrastate, the shipper's intent can trump even logistics. "If the shipment comes to rest within the state of origin and the goods are thereafter disposed of locally, the interstate character of the shipment is lost, but temporary storage within the state, made necessary in furtherance of interstate carriage, does not change its character."[58]

---

[56] Canal memo at 15.

[57] *State of Texas v. United States*, 866 F.2d 1546, 1556 (5th Cir. 1989).

[58] *Id.* at 1559.

In the case at bar, the evidence from which no genuine issue arises shows clearly that the shipment in question was interstate in character. Roger Walker purchased livestock that, only days before, had been scattered across four states, and he registered the purchase with a company many states away from his own. From Mississippi, he fully intended to have the cattle brought to him in either Kansas or Oklahoma.[59] The only reason he ordered them held at the preconditioning lot in Courtland, Miss., was to prepare the calves physically for the long trip ahead – a step "necessary in furtherance of interstate carriage."[60] No evidence exists to suggest that Walker intended to have the livestock "disposed of locally"[61] in Mississippi. Walker intended only that the calves' stopover in Courtland be a "temporary storage."[62] The shipment's essential character, therefore, unquestionably was interstate in nature. And when the question arises of whether travel was interstate, the broader character of the full travel controls the answer.

For that reason, the MCS-90 Endorsement was in effect at the time of the crash.

Finally, Canal argues that the MCS-90 Endorsement only insured R.D. Owens and does not apply to any negligent acts on the part of Peninger. Because R.D. Owens was the Canal policy's name insured, Canal contends that the policy did not extend to cover the negligent acts

---

[59] Defendant Amanda Pugh's Memorandum of Law in Support of Response in Opposition to Canal Insurance Company's Motion for Summary Judgment [Docket No. 39] (hereinafter "Pugh response memo") at 13 (citing Deposition of Roger Walker, Exhibit I to Pugh Motion for Summary Judgment [Docket No. 34-9] at 7, 21).

[60] *Texas v. United States*, 866 F.2d at 1559.

[61] *Id.*

[62] *Id.*

of Peninger.[63]

Canal is correct that an MCS-90 Endorsement extends only to indemnify the negligent acts of the named insured.[64] But Canal ignores the fact that, under the *respondeat superior* theory advanced by Pugh in her Neshoba County complaint,[65] an employer can be bound by his employee's negligent acts.[66] To be sure, a driver not named on the policy will not be indemnified thereby,[67] but that conclusion is irrelevant to the question of whether the policy's coverage extends to acts by which the insured can be held liable.

In sum, Pugh's argument that the MCS-90 Endorsement extends Canal's obligations to the event described in the Neshoba County complaint is compelling, and none of the reasons offered by Canal to the contrary is persuasive.

## CONCLUSION

The MCS-90 Endorsement attached to Canal's policy extends the policy's coverage to include Bearden's injuries suffered in the November 2006 crash. Therefore, Pugh's motion for

---

[63] Canal memo at 17.

[64] *Ooida Risk Retention Group, Inc. v. Williams*, 579 F.3d 469, 477-78 (5th Cir. 2009). *But see Integral*, 930 F.2d at 260-61 (noting that the plain meaning of the endorsement only requires a final judgment against the insured arising out of the negligent operation, maintenance or use of the motor vehicle; if the Secretary of Transportation "intended judgment to be founded upon the insured's own active negligence, the endorsement would read 'any final judgment recovered against the insured for public liability resulting from *the insured's* negligence in the operation, maintenance or use of motor vehicles.'") (emphasis in original).

[65] Exhibit C to Pugh Motion for Summary Judgment [Docket No. 34-3] at 4.

[66] *Richardson v. APAC-Mississippi, Inc.*, 631 So. 2d 143, 151 (Miss. 1994). *See also Welch v. Loftus*, 776 F. Supp. 2d 222, 225 (S.D. Miss. 2011); *Gaddis v. Hegler*, 2011 WL 2111801, *3 (S.D. Miss. May 26, 2011).

[67] *Ooida*, 579 F.3d at 477.

summary judgment is granted, and Canal's motion for summary judgment is denied.

Because this determination resolves the merits of the case, a Final Judgment will be entered accordingly.

SO ORDERED this Twelfth day of October 2011.

    /s/ *Carlton W. Reeves*
Hon. Carlton W. Reeves
United States District Court Judge